UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PAUL MURRAY,

    Plaintiff,

v.                                                                CASE NO.: 8:20-cr-824-T-24AEP

PRONTO INSTALLATIONS, INC.
and CHRISTOPHER IRVIN,

    Defendants.
_____/

**O R D E R**

**THIS CAUSE** comes before the Court on Plaintiff Paul Murray's Motion to Dismiss Amended Counterclaim and Motion to Strike Attorney Fee Demand (Doc. 28) and Defendant Christopher Irvin's Response in Opposition (Doc. 31). As outlined below, the Motion to Dismiss is due to be granted and the Motion to Strike Attorney Fee Demand is due to be denied as moot.

**I.  BACKGROUND**

Defendant Pronto Installations, Inc. ("Pronto") is a company that provides appliance installation services throughout West Florida for residential and commercial customers. Defendant Christopher Irvin ("Irvin") is the President and owner of Pronto. Plaintiff Paul Murray ("Murray") was employed by Pronto as an installation technician from January 2017 to February 18, 2020. In his two-count Complaint, Murray sues Pronto and Irvin for failure to pay him overtime compensation for hours worked over 40 in any work week during the three years of his employment, in violation of the Fair Labor Standards Act ("FLSA"), 28 U.S.C. § 201, *et seq*.

(Count I) and for terminating his employment without notice in retaliation for complaining about his unpaid overtime hours, in violation of 29 U.S.C. § 215(a) (Count II).

In response to the Complaint, Irvin filed a one-count Counterclaim for defamation *per se*. (Doc. 25). He alleges that immediately after he terminated Murray's employment on February 18, 2020, Murray posted on his personal Facebook page defamatory false statements specifically identifying Irvin, by name, and "tagging" Irvin's Facebook page in a series of three posts. (*Id.*) The posts were as follows:

> 2:33 PM:
>
>> It's funny to me how cocksuckers like Chris Irvin think he can mentally and physically abuse people and think he's going to get away with it. Lie to you, steal from you. The whole nine then there is a problem when he's confronted about it and told that there are legal ramifications behind his actions regardless of how he feels. It's all good though. The lawyers agree with me and he was too dumb to listen to the warning. Oh and btw this cocksucker is the reason for my heart attack. He then hid the workers compensation from me claiming that worker's compensation doesn't pay for heart attacks meanwhile I got hurt on the job and it was caused by his actions because he thinks everything is a game. Well, we will see how much of a game it is.
>
> 2:43 PM:
>
>> There are people in this world that will take your life because of their greed. You better keep your eyes peeled because I'm here to tell you it's one of them that you think is a friend.
>
> 3:09 PM:
>
>> I wonder what Lowe's is gonna think when they find out what I have to say.

(*Id.*)

Irvin alleges that the statements in these posts falsely accuse him of worker's compensation fraud, dishonest acts, and theft. He alleges that at the time of the posts, he and

2

Murray were Facebook friends and they had Facebook friends in common, including a number of current Pronto employees and Mr. Irvin's wife. Irvin alleges that his wife and two Pronto employees saw Murray's posts soon after they were put on Facebook, alerted Irvin to them, and raised concerns with Irvin about the negative impact of the statements on Pronto's business and Irvin's professional reputation, and about the possible legal ramifications of the statements. He alleges Murray did not restrict access to his Facebook page and, thus, the posts were viewed by a number of other people as well.

The Court observes from a review of the posts that seven other people reacted to Murray's first post by posting a "like" and two other people reacted to it by posting the comments "Get 'em!" and "Get urs homie." (Doc. 25, Ex. 1). Ten people reacted to Murray's second post by posting a "like." (*Id.*) One person reacted to Murray's third post by posting a "like." (*Id.*)

Irvin contends that the statements in the three Facebook posts constitute defamation *per se* and he seeks damages for his injuries, costs, and attorney's fees for the counterclaim. (Doc. 25, p. 12). Murray seeks dismissal of Irvin's counterclaim, pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure, for failure to state a claim of defamation *per se*. He also requests that the Court strike Irvin's demand for attorney's fees as not authorized by a statute. Irvin states in his response to Murray's motion that he is now withdrawing his demand for attorney's fees. (Doc. 31, p 16). Therefore, only Murray's motion to dismiss Irvin's counterclaim requires resolution by the Court.

## II. STANDARD FOR DISMISSAL

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint, or in this case, the counterclaim. In assessing the merits of a Rule 12(b)(6) motion to dismiss a counterclaim, as

3

when examining a motion to dismiss a complaint under the same rule, the court assumes that all the factual allegations set forth in the counterclaim are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).[1] To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a counterclaim need not contain "detailed factual allegations," but must include enough facts "to raise a right to relief above the speculative level on the assumption that all allegations in the [counterclaim] are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955.

### III.  ANALYSIS

Murray argues that Irvin failed to plead sufficient facts to state a plausible basis for his defamation *per se* cause of action. Under Florida law,[2] to assert a claim for defamation—libel or slander—a plaintiff must allege that: "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) that the falsity of the statement caused injury to another." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (applying Florida law). A written publication—like a Facebook post—rises to the level of libel *per se* "***if***, ***when considered alone and without innuendo***, it (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to subject one to hatred,

---

[1] A motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) is evaluated in the same manner as a motion to dismiss a complaint. *Geter v. Galardi South Enterps., Inc.*, 43 F. Supp. 3d 1322, 1325 (S.D. Fla. 2014) (citing *Great Am. Assur. Co. v. Sanchuk, LLC*, No. 8:10-cv-2568-T–33AEP, 2012 WL 195526, at *2 (M.D. Fla. Jan. 23, 2012).

[2] Irvin alleges that Murray's defamatory statements were published in Florida, and thus Florida state law is controlling. *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.*, 378 F.2d 377, 381 (5th Cir. 1967).

4

distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Id.* (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)) (emphasis added).

"The significance of the classification of a communication as actionable *per se* lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973). In a libel *per se* action, **consideration is given only to the "four corners" of the publication**. *Ortega Trujillo v. Banco Central Del Ecuador*, 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998) (citation omitted) (emphasis added). The statement **should not be interpreted in the extreme, but as the "'common mind' would normally understand it."** *Id.* (citation omitted) (emphasis added). And, "[w]here the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in . . . dismissing the complaint for failure to state a cause of action." *Wolfson*, 273 So. 2d at 778 (citations omitted).

Irvin alleges that the statements in Murray's Facebook posts qualify as defamation *per se* because they: (1) charge him with the commission of infamous crimes; (2) tend to subject him to hatred, distrust, ridicule, or contempt; and (3) tend to injure him in his trade or profession. On the contrary, the Court finds, as argued by Murray, that the statements, when analyzed as the common mind would understand them and considered alone and without innuendo, do not rise to the level of libel *per se* under any of Irvin's asserted grounds. In fact, only the first of the three Facebook posts—made on February 18, 2020, at 2:33 PM—mentions Irvin's name. The statements in the second and third posts—made 10 and 26 minutes later, respectively—do not mention Irvin's name and, thus, when the Court gives consideration only to the four corners of the statements, it finds that they do not constitute defamation *per se* as to Irvin. Indeed, the Court

5

cannot determine with certainty that the statements in the second and third posts are even about Irvin.

Accordingly, the Court need only analyze Murray's statements in the first Facebook post, which were:

> It's funny to me how cocksuckers like Chris Irvin think he can mentally and physically abuse people and think he's going to get away with it. Lie to you, steal from you. The whole nine then there is a problem when he's confronted about it and told that there are legal ramifications behind his actions regardless of how he feels. It's all good though. The lawyers agree with me and he was too dumb to listen to the warning. Oh and btw this cocksucker is the reason for my heart attack. He then hid the workers compensation from me claiming that worker's compensation doesn't pay for heart attacks meanwhile I got hurt on the job and it was caused by his actions because he thinks everything is a game. Well, we will see how much of a game it is.

For the reasons that follow, Irvin fails to allege ultimate facts demonstrating that these statements are libel *per se*:

**A. The Statements Do Not Charge Irvin With The Commission Of Infamous Crimes**

Because the statements in Murray's first Facebook post name Irvin in conjunction with the phrases "steal from you" and "hid the worker's compensation from me, claiming that worker's compensation doesn't pay for heart attacks," Irvin maintains that Murray is charging him with having committed acts that constitute the infamous crimes of felony theft (under section 812.014, Florida Statutes) and felony insurance fraud (under section 440.105(4)(a)(5), Florida Statutes). (*See* Doc. 25, pp. 3-4, 9-11). Crimes characterized as having an infamous nature are "murder, perjury, piracy, forgery, larceny, robbery, arson, sodomy or buggery." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, n.3 (S.D. Fla. 2014). However, if an offense does not fall into one of these categories, only a felony is considered an infamous crime.

6

*Id.*; *Madsen v. Buie*, 454 So. 2d 727, 729-30 (Fla. Dist. Ct. App. 1984) ("Under Florida law, a publication is libelous *per se* when it imputes to another a criminal offense amounting to a felony."). "To survive a motion to dismiss on this ground, a plaintiff must show that the statement, as read and understood by the 'common mind,' suggests that the plaintiff committed [a] felony . . . under Florida law." *Aflalo v. Weiner*, No. 17-61923-CIV-MORENO, 2018 WL 3235529, at *3 (S.D. Fla. July 2, 2018). Irvin fails to meet his burden.

Irvin contends that Murray's post accused him of theft. Section 812.014, Florida Statutes, titled "Theft," states, in relevant part:

> (1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:
>
> (a) Deprive the other person of a right to the property or a benefit from the property.
>
> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

§§ 812.014(1)(a)-(b), Fla. Stat. The Court concludes that Murray's statements, when considered alone and without innuendo, are devoid of any accusations that Irvin deprived anyone of a right to property or a benefit from property or that he appropriated property for his or someone else's use.

Irvin also contends that Murray's post accuses him of insurance fraud. Section 440.105, Florida Statutes, titled "Prohibited activities," states, in relevant part:

> (4) Whoever violates any provision of this subsection commits insurance fraud, punishable as provided in paragraph (f).
>
> (a) It shall be unlawful for any employer . . . ;
> . . . .

> 5. To knowingly make any false, fraudulent, or misleading oral or written statement, or to knowingly omit or conceal material information, required by s. 440.185 or s. 440.381, for the purpose of obtaining worker's compensation coverage or for the purpose of avoiding, delaying or diminishing the amount of payment of any worker's compensation premiums.

§ 440.105(4)(a)5, Fla. Stat. The Court finds that Murray's statements also lack any accusations about "insurance" or "fraud" when considered alone and without innuendo. Section 440.105(4)(a)(5), Florida Statutes, does not prohibit an employer from telling an employee that "workers compensation doesn't pay for heart attacks," and Murray does not accuse Irvin of intending to defraud an insurer. Accordingly, the Court finds that nothing in the subject statements supports Irvin's conclusion that Murray's use of the phrases "steal[s] from you" and "hid the worker's compensation from me, claiming that worker's compensation doesn't pay for heart attacks" amounts to accusing Irvin of having committed felonies. *See McCormick v. Miami Herald Publ'g Co.*, 139 So. 2d 197 (Fla. Dist. Ct. App. 1962) (holding that allegedly defamatory language "should not be interpreted by extremes, but should be construed as the common mind would naturally understand it"). For these reasons, the Court finds that when Murray's statements in the first Facebook post are read and understood by the "common mind," they do not charge Irvin with the crimes of theft and insurance fraud, as defined under sections 812.014 and 440.105(4)(a)5 of the Florida Statutes, respectively, and, therefore, Irvin fails to adequately plead a claim for libel *per se* under the first ground.

### B. The Statements Do Not Tend to Subject Irvin To Hatred, Ridicule, Or Contempt

Irvin alternatively claims that Murray's statements in the first Facebook post subject him to "hatred, distrust, ridicule, contempt or disgrace." For support, he points to Murray having mentioned his name in conjunction with the phrases "mentally and physically abuse[s] people,"

8

"lie[s] to you," "steal[s] from you," "reason for my heart attack," and " hid the worker's compensation from me." However, "a defamation claim may not be actionable when the alleged defamatory statement is based on non-literal assertions of fact or rhetorical hyperbole that cannot reasonably be interpreted as stating actual facts about an individual." *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (quotations omitted). "It is for the Court to decide, as a matter of law, whether the complained of words are actionable expressions of fact or nonactionable expressions of rhetorical hyperbole." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006).

A statement is considered rhetorical hyperbole when "the language itself negates the impression that the writer was seriously maintaining that the plaintiff committed the particular act forming the basis of the defamation." *Id.* (internal quotations and citations omitted). Although rhetorically hyperbolic statements may at first blush appear to be factual, they cannot reasonably be interpreted as stating actual facts about their target." *Id.* at 1378-79. "In determining whether an allegedly defamatory statement is an expression of fact or an expression of rhetorical hyperbole, context is paramount." *Id.* at 1379. "All of the circumstances surrounding the publication must be considered, including the medium by which it was disseminated and the audience to which it was published." *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714 (11th Cir. 1985).

The culture of internet communications, as distinct from that of print media such as newspapers and magazines, has been characterized as encouraging a "freewheeling, anything-goes writing style." *See* Cheverud, Comment, *Cohen v. Google, Inc.*, 55 N.Y. L. Sch. L. Rev. 333, 335 (2010/11).

> It is . . . imperative that courts learn to view libel allegations within the unique context of the Internet. The defamatory import of the communication must be viewed in light of the fact that bulletin

9

> boards and chat rooms 'are often the repository of a wide range of casual, emotive, and imprecise speech,' and that the online 'recipients of [offensive] statements do not necessarily attribute the same level of credence to the statements [that] they would accord to statements made in other contexts.' Because the context of a statement impacts its potentially defamatory import, it is necessary to view allegedly defamatory statements published on the Internet within the broader framework on which they appear, taking into account both the tenor of the chat room or message board in which they are posted, and the language of the statements. The low barrier to speaking online allows anyone with an Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information. Often, this results in speech characterized by grammatical and spelling errors, the use of slang, and, in many instances, an overall lack of coherence.

O'Brien, Note, *Putting a Face to a (Screen) Name: The First Amendment Implications of Compelling ISPs to Reveal the Identities of Anonymous Internet Speakers in Online Defamation Cases*, 70 Fordham L. Rev. 2745, 2774–2775 (2002) (citations omitted). Due to the informal nature of social media pages, like Facebook, "reasonable readers of most Facebook pages do not understand [posts] to be conveying factual information," and this must be taken into consideration by a court when analyzing the "context" of the statement. *See* Ellyn M. Angelotti, Twibel Law: What Defamation and its Remedies Look Like in the Age of Twitter, 13 J. HIGH TECH. L. 433, 472-73 (2013).

  Here, Irvin alleges that Murray posted the statements about Irvin, his boss, on his personal Facebook page immediately after Irvin fired him without notice after he complained about unpaid overtime. When the context of Murray's statements is taken into consideration, it becomes clear to this Court the statements were used on an informal social media platform in a loose, figurative sense as rhetoric or hyperbole—Murray was venting out of frustration on his personal Facebook page for being wrongfully terminated without notice. *See, e.g., Patterson v.*

10

*Grant-Herms*, 2013 Tenn. App. 675 (Tenn. Ct. App. Oct. 8, 2013) (defamation claim was properly dismissed where Facebook and Twitter posts were "expressions of [defendant's] frustrations and complaints that she was not able to board the flight in a manner she wanted").

The Court finds *Couloute v. Ryncarz*, 2012 WL 541089 (S.D.N.Y. Feb. 17, 2012), to be instructive. In *Couloute*, the court held that the plaintiff could not sue an ex-girlfriend for defamation for statements posted on an internet forum, liarscheatersrus.com, that the plaintiff "uses people," that he "rents or finances everything and owns nothing," and that he is "great at lying." *Id.* at *2. The *Couloute* court noted that the website where the defendant posted her statements is "specifically intended to provide a forum for people to air their grievances about dishonest romantic partners" and that the reasonable reader would know that the comments are "emotionally charged rhetoric and the opinions of disappointed lovers." *Id.* at *6 (citations omitted). Given this context, the *Couloute* court found that the comments were viewed as rhetorical hyperbole and opinion. *Id.*

Similarly, a reasonable reader of Murray's Facebook post would have known that the statements therein were "emotionally charged rhetoric" and the opinions of a frustrated employee who was immediately discharged after complaining about unpaid overtime. Therefore, this Court likewise finds that Irvin fails to convincingly plead that the statements in Murray's first Facebook post, or the circumstances surrounding them (*i.e.*, the parties involved, the medium chosen, the words used), engender the type of hatred, distrust, ridicule, contempt or disgrace that is required to succeed under Irvin's second ground for his claim for libel *per se*.

### C. The Statements Do No Tend to Injure Irvin's Trade Or Profession

Finally, Irvin contends that Murray's statements tend to injure him in his trade or profession. Under this ground for his claim of libel *per se*, defamatory statements must impute

11

conduct to plaintiff that is "incompatible with the essential functions of [his job], when the context of the statements is considered." *Scobie v. Taylor*, 2013 WL 3776270, at *3 (S.D. Fla. July 17, 2013). The Court has examined the context of Murray's statements and found that they were made in a loose, figurative sense as rhetoric or hyperbole out of frustration for being wrongfully terminated without notice. Nothing in Murray's statements directly accuses Irvin of physical or mental abuse, lying, stealing, or workers' compensation fraud. Therefore, Irvin fails to adequately plead a claim for libel *per se* under his third ground.

## IV. CONCLUSION

Based on the above, the Court finds that Irvin's counterclaim for defamation *per se* fails. Murray's statements in his Facebook posts are not the type for which damages to Irvin can be presumed. If Irvin has, in fact, been damaged by the statements in a manner that can be proven to a trier-of-fact, then he may amend his counterclaim in order to assert a regular defamation claim, rather than a claim of defamation *per se*.

**ACCORDINGLY**, it is **ORDERED AND ADJUDGED**:

1. Paul Murray's Motion to Dismiss Amended Counterclaim(Doc. 28) is **GRANTED**. Defendant Christopher Irvin's Counterclaim for defamation *per se* is dismissed.

2. Paul Murray's Motion to Strike Attorney Fee Demand (Doc. 28) is **DENIED AS MOOT**.

3. Christopher Irvin may file an amended counterclaim, if he wishes to assert a regular

claim of defamation, *no later than November 30, 2020*.

**DONE AND ORDERED** at Tampa, Florida, this 16th day of November, 2020.

SUSAN C. BUCKLEW
United States District Judge